Three patent cases, two from the district courts, one from the PTAB, and a veterans case which will be our first argued case, which is Myrna Hansen-Sorensen versus the Department of Veterans Affairs, 2017-24-18. Mr. Carpenter. May it please the court. Kenneth Carpenter appearing on behalf of Mrs. Hansen-Sorensen. Congress in 38 U.S.C. 101-2 defined the term veteran to mean person, a person who served in the active military, naval, or air service. In section 101-24, it identified three specific subcategories of such service. These categories have previously been interpreted, the latter two, by the VA to exclude status as a statute. In June of 2015, again in September of 2015, the Secretary did rulemaking concerning whether or not reserve units, reserve component members, were entitled to presumption for exposure to Agent Orange when their stateside duties in cleaning C-123 aircraft and reservists and guard during a specified period were presumed to have been contaminated by the water at that facility. These regulations rely upon a new interpretation of the phrase previously interpreted, active military, naval, and air service. These interpretations by the Secretary cannot be limited to the reserve components who clean C-123 aircraft or reservists or guard members who are simply present at Camp Lejeune. These new interpretations remove any previous limitation that veterans to the veteran status must be excluded and all individuals who served on active duty for training as well as inactive duty for training must now be considered to be veterans. The Veterans Court in the decision on appeal did not address this question. Under the existing rules of deference, this court in Bowers deferred to the Secretary's then interpretation of that phrase. In Bowers, this court deferred to the Secretary's interpretation of the phrase as excluding active duty for training service members and thus Mr. Bowers did not qualify as a veteran for the same presumption that Mr. Hansen seeks under 38 CFR 3.318. So what we have here is a situation in these two regulations where they track the statutory language and they're saying that they're presumed to have become disabled during their period of service. Correct. And so I'm not sure that's a different interpretation of the statute. It's just saying with respect to two particular situations that they're going to presume that the statutory requirement was satisfied and they haven't done that here with respect to ALS. Why is it, let's say, arbitrary and capricious for them to do that with respect to the two situations that they did do it but not with respect to ALS? Because the substance of all three regulations are the same. It is mere presence within active military service that causes the presumption to be triggered. There is no difference between a service component member cleaning a Mr. Hansen who served for more than 90 days on active duty training. That's the question because it's two different diseases or conditions. Correct. The diseases or conditions are different, Your Honor, but the qualification for compensation which Mr. Hansen has been explicitly excluded from is based upon his non-status as a veteran. The VA in these subsequent regulations has conferred the status of veteran on these individuals. There is no rational basis for allowing the presumption in these two circumstances and not in the circumstance for ALS. ALS is a very generous regulation that simply requires that at any time after a period of service, there is an enlisted person who was serving at the exact same time that Mr. Hansen was on active duty for training in 1959. Those two individuals had exactly the same, quote, exposure to military service and one is entitled to the benefit of the presumption and one is excluded. The presumption for ALS does not apply if the individual, if the ALS was not incurred during active military service. That's correct. This person didn't have that, right? He did, Your Honor, because he was a veteran. He was active for training. Yes, but now the VA has in the two regulations at issue here have said that service component, or excuse me, reserve component members who cleaned C-123s were in fact veterans and therefore entitled to that benefit and did the same thing for reservists and guard members who were simply physically present on the grounds of Camp Lejeune for a period of more than 30 days. The circumstances are identical, particularly in the Camp Lejeune situation and the Camp Lejeune situation is 60 days less time spent. It is simply about the physical presence while on active military service and if you look back at the language of 101-24, it says the term active military, naval, or air service includes and it specifies the three types of service that are included. But that's the general, doesn't the specific Governor General? If it would, frankly, Your Honor, unless interpreted otherwise by the and it has been interpreted otherwise by the Secretary in two regulations that were promulgated. In the regulation that was promulgated for ALS, the Secretary did not expressly address the definition of veteran in terms of specifically including individuals. In the two regulations subsequent in 2015 and 2017, the Secretary did exactly that. He specifically identified reserve component units that were cleaning stateside these aircraft that were involved in Agent Orange distribution and in the Camp Lejeune identified both reservists and guard members. And as a consequence, he has now expanded that definition to say that any specificity is overcome in the language of the regulation based upon the uniquely latent effects of exposure which were largely unrecognized at the time of these statutory provisions were created referring to 101-24. But doesn't doesn't that language invoke, I guess the point that Judge Dyke began with, the particular exposures for particular conditions and the fact that there was a finding by the Secretary in the two situations, the C-123 situation and the Camp Lejeune situation, that the particular regular or I guess statutory limitation under 101-24 B and C, the incurred or aggravated in line of duty, would be deemed to be met for those conditions and those exposures, doesn't logically imply anything particularly about ALS, a different condition without the underlying airplane or Camp Lejeune exposure. But with respect, Your Honor, that's precisely what the Secretary did when he promulgated 3.318. He made those exact findings. What he didn't do was to specifically identify people at, or excuse me, service members as other than veterans. When the Secretary acted in the he had to know that that interpretation was directly in opposition to the interpretation that he offered in the Bowers case. The Bowers case only turns on this Court's deference to that interpretation. Is that right? Did we use the language of deference in Bowers? I believe that Judge Hughes did, Your Honor. At page 313, excuse me, 1353 to 1354, I don't have the precise quote in my notes, but I do believe that it was a question of deferring to the reasonable interpretation of what was meant by the term veteran. And it's also important to note that in the regulation, it is the term veteran that is used. It is not the term that was relied upon under 101-24 B and C about the active duty or inactive duty for training. Simply the phrase of those persons who served in active military or naval service, but that phrase is not used in the regulation at 3.318. The term that is used is merely the term veteran. And the important language in that regulation is it says any veteran. And in the language of... I don't think that the Secretary could distinguish between a disease or a condition that resulted sort of automatically from an event that occurred during the training period and a disease or injury that occurred only occasionally as a result of an event that happened during the training period in terms of the language here. I do not think he could do so without being arbitrary to the extent that he excludes that same benefit under 3.318. And the reason for that is that the exact same analysis is used based upon the change in the understanding of medical science. And in the Bowers case, it was specifically noted that the Secretary published 3.318 because medical studies indicated a statistical analysis between the activities and it is just the activities of military service and the development of ALS. The Secretary nonetheless determined that the proof of active military or naval service together with the development of ALS following service would be sufficient to establish the entitlement. That's precisely what the Secretary did in the Agent Orange expansion and in the contamination of water. I see that I am substantially into my reserve time for rebuttal and I'll... We will save it for you Mr. Carpenter. Mr. Yale. May it please the court. We'd first like to address a couple of the issues raised by a claimant appellant. First of all, these are two different situations and frankly three different situations. We have the Camp Lejeune factual... They may be, but what troubles me a little bit is that we don't have an explanation from the Secretary as to why the three, two of the situations are different from the ALS situation, do we? Well, we have in the notice and comment for the regulations, we have references to the studies underlying the regulation. So we have, with regards to C-123, there was a study which had a correlation between these individuals who were serving on the C-123s. And we have, with regards to the ALS regulation, there was... What do you understand to be the difference between the two regulations and the ALS situation? Well, with regards to the two regulations Camp Lejeune, there are different presumptions. So when the VA in the Camp Lejeune and in C-123, when they wanted to have a presumption that exposure to contaminants or exposure to Agent Orange constituted an injury for the purposes of 101-24, they wrote that into the regulation. That's specifically, that language is in the regulation. I don't think that's a distinction that they specifically wrote it into the regulation. Why in terms of the interpretation of this language, is there a difference between the two situations where they said that we're going to presume that there was an injury during the training period or whatever it is, and the situation with ALS? Well, I think that the ALS, the studies that were relied upon there, were less conclusive and... Less conclusive of what? About causation? About any sort of causation that would come out of... ALS, the studies are not, they're not pointing to a specific exposure or a specific contaminant. They're not pointing to the fact that, for example, Agent Orange was used in a certain place. What they're saying was, and they used the phrase, there was limited and suggested evidence of a correlation between military service and the onset of ALS. And what they did was, in accordance with really all the regulations, you get that presumption. Those who just served in the National Guard do not, and that's really the default. So in these other regulations... They don't get it unless there was an injury causing disability during the period of training, right? Correct, Your Honor. So they can still buy, for example, direct service connection. And these two regulations with respect to Agent Orange, they're not pointing to people who were exposed during the training period, even though they didn't actually manifest an injury at that point. Correct, because the VA looked at the studies and what they're pointing to is the fact that there's evidence, for example, in Camp Lejeune, that there was dry cleaning fluid apparently dumped at or near the base. And there's other heavy metals. With regards to C-123, what they're pointing to is the fact that on the C-123 airplanes that went back to the United States after having sprayed Agent Orange in Vietnam, that there's herbicides on those planes. So they're pointing to specific exposures, and the exposure being the specific injury. We don't have that with the ALS regulation, and there's really nothing in the regulatory history pointing to something like that in-service injury that you have with these other regulations. And the VA recognized the definition of a veteran. They put the specific language into these regulations. How many other situations are implicated here? How many other regulations do we have like the ALS regulation, which would be affected if we were to hold, hypothetically, that the Secretary had to extend the same treatment as in the Agent Orange, Camp Lejeune-like regulations to other regulations? How many other situations? Well, I can't give you a number offhand. I would think some of the chronic disease regulations, it would apply to those. So a fair number? I would think a fair number, but it's, I mean, we hadn't, it's a question we obviously hadn't briefed. What was the date of the ALS regulation, 318? I believe it's 2008-2009. And what did the underlying scientific studies say? I think you referred in passing not to any kind of correlation of the disease with any specific exposure, but rather, I think your language was with military service. Correct. Can you be a little bit more specific? Sure. The phrase that was used was there was, when they surveyed, it was a couple of different studies, that there was limited and suggested evidence of association between military service and ALS. The main study, I think, went back and looked at years of service for veterans who had served in the Korean War, World War II, in Vietnam. But what nobody has pinpointed in the scientific evidence is, where is this coming from? Well, even aside from, you know, specific identifiable causes or the absence of them, did the underlying service versus, you know, stateside service or anything that would suggest that a 182-day period of active duty for training of the sort at issue here would itself be correlated with ALS? I don't believe, the short answer is I don't know, but I don't believe that's the case. They were talking about years of service. I don't think that the results of those studies got down into a correlation between, for example, you know, if there had been 20 years as opposed to five years, whether that mattered. I think, frankly, they weren't able to draw that specific correlation. And just in general, I think that the scientific evidence is just not very conclusive. What about in the opposite situation with respect to the Agent Orange studies and the Camp Lejeune studies? Did those show that even a brief exposure could lead to later disability? I believe the actual Camp Lejeune studies had more to do with not anything specific to these individuals. There's much more of, these were the chemicals that were used and then based upon other scientific studies with regards to these particular chemicals, what may happen. Even as a result of a brief exposure? Right. So here they, I don't think they were able to draw a definitive line, but they drew 30 days and that's, I think in the regulatory history, the VA drew that line at 30 days because that was similar to the statute, the Camp Lejeune Act, which has more to do with health care, but they were matching it up there. I mean, the basic, I think, rationale would be if somebody went to Camp Lejeune for one day, just as a matter of common sense and logic, they're less likely, if what we're talking about is exposure to drinking water and contaminants in the drinking water, they're less likely to get a disease. But I think overall, with regards to ALS, the general default is, you know, veterans themselves get the benefits and those who would just have National Guard service do not. So the other two regulations, do they say that you need to have 30 days of exposure to get the presumption or to get the... Well, Camp Lejeune has a 30-day requirement. I'm not sure about the C-123. I think what they're talking about is there needs to be consistent service, frequent service on these C-123s based upon their service records, but I don't think it's a specific number of days. Regularly and repeatedly operated, maintained, etc. Correct. And we'd also like to respond a little bit to the Bowers case. I mean, I think just looking back at that case, I don't think it ever uses the word deference there. It seems Bowers is a precedent of this court's directly on point. And really what the panel there did was look at the plain language of the regulation in the statute. It wasn't deferring to an interpretation of the VA in that instance. It's just looking at the plain language of the statute and the regulation. And is it right that in an individual benefits case, aside from the large question of whether this is practical for any individual, a claimant can try to prove the condition of 10124B, namely injury incurred or aggravated in the line of duty? Certainly, Your Honor. There can always... I mean, you can have a direct benefits case where you can point to an injury and, you know, based upon I think the regulation 3.303, you know, if you can, by the service records, medical records, I mean, if you can show that there was an injury that occurred during your active duty for training, then you can meet that requirement. You have to show that the disability manifested itself during the period of training? Well, it would have to be incurred. And so for example, for something like ALS, I mean, there would need to be, you know, you would need to... taking out the ALS presumption, but just talking about direct, you know, a direct service connection. I mean, there would need to be something in the record showing that, you know, there was an injury or incurrence during your service. I understand that, but does the disability have to be manifested during the training period? Yes, it would have to be. You'd have to point to something showing that would be manifested. I mean, where do you get that from? In the language of just of 10124B, where's the disability manifest idea? Well, it would be from incurrence, and then I think if you then were to look at the various other regulations that the VA has promulgated, I mean, 38 CFR, I think 3.303 is the one that talks about service connection and having it be coincident, you know, injury be coincident with service. But in this case, just like... But in these other two regulations, what they've done is they said you don't have to show that you became disabled during the training period, right? Well, because they're presumptions. I mean, so there's obviously two ways you can establish these facts. I mean, one would be through a direct service connection claim looking at the facts from service records. The other one is through various presumptions. So, in the Camp Lejeune regulation, there's presumptions that, you know, it's both saying that this exposure constitutes an injury and also that it was disabling at the time of service. And that presumption... Even though it wasn't manifested. Even though it wasn't manifested, but that's, I mean, the VA under its power under, you know, Section 1 has the ability to, you know, provide these factual presumptions to help certain individuals get their benefits, which is what was happening with these two discrete, distinct groups of individuals. Do you agree that in doing so and denying it to the ALS group that it has to be non-arbitrary? Well, I don't really see the connection, really, between... I think they're two completely different scenarios. And the fact that the VA can, in one situation, define an injury based upon a certain disease, I don't think that really says anything about defining what the injury is with regards to ALS. It doesn't have to be rational to distinguish between the two kinds of situations. Well, I mean, I'm not sure... Are we talking about upholding a challenge to 3.318? Are we talking about a challenge to the Camp Lejeune regulation? I mean, really what... It's not a challenge to the Agent Orange or Camp Lejeune regulations. It's saying that your treatment of the ALS group is arbitrary and capricious compared to what you've done for these other two groups. And I guess what I'm hearing you is you're saying that we don't even test it by an arbitrary and capricious standard, which seems to me... Well, we can certainly test it by an arbitrary, capricious standard. I mean, from what we set forth, the VA has put forth a rational basis for what they're doing. They're providing it to veterans, which in and of itself, I mean, I think is almost on its face rational. And so I think we would meet that standard certainly, but I also think that Bowers is on point and there really has been no change in the law. And certainly these statements in regulatory history doesn't constitute that. Thank you, counsel. Mr. Popham, do we have some rebuttal time? Ma'am, please, court. There is no rational basis for the differing interpretations between these three regulations. All three regulations involve presumptions. All three regulations involve circumstances in which it is simply the physical presence in your service and whether or not the definition under... But that's not really right. The C-123 requires, whatever that phrase is, we were referring to regular and something maintaining or operating of the planes. The Camp Lejeune means presence in a particular location where the water was foul, but there's no similar identification of a particular condition in the 318 ALS, is there? Well, there is no other than physically being on duty, that you were in the uniform and you were performing your services as a member of the military. And that's what Mr. Hansen was doing. And there is no rational basis between saying he is not a veteran for ALS purposes for the presumption versus a person at Camp Lejeune who was simply on the camp at the time. So the difference here is simply arbitrary in the view of affording the status of a veteran. The regulations have decided that in the circumstances for Agent Orange exposure, doing this cleaning was constituted service by a veteran. That's what allows that reserve component to get the compensation. The compensation is afforded under 1110, but the veteran must have the status of being a veteran, which is what is afforded to them in the interpretation relied upon of 10124 in both the Camp Lejeune and the Agent Orange regulation that is not extended and afforded to Mr. Hansen in 3.319. See, I'm at the end of my time unless there's further questions from the panel. Thank you very much, Eric. Thank you, Mr. Carpenter. We'll take the case under advisement.